The STATE of Ohio, Appellee,

v.

WELCH, Appellant.

[Cite as *State v. Welch* (1997), 125 Ohio App.3d 49.]

Court of Appeals of Ohio,
Eleventh District, Portage County.

No. 97–P–0015.

Decided Dec. 1, 1997.

*Victor V. Vigluicci,* Portage County Prosecuting Attorney, *Marrett W. Hanna* and *Paul A. Russell,* Assistant Prosecuting Attorneys, for appellee.

*James J. Aylward,* Portage County Public Defender, for appellant.

NADER, Presiding Judge.

In this accelerated calendar case, we are called upon to decide if a person who is presently diagnosed as suffering from mild depression, antisocial personality disorder, and various substance abuse disorders has a "mental illness" under the statutory definition of that term in R.C. 5122.01(A).

Defendant-appellant, Joseph "Friday" Welch, was found not guilty of murder charges by reason of insanity in 1987 and was thereafter institutionalized. The events leading to this disposition of Welch's case are uncomplicated, yet tragic. He was hospitalized for a spinal cord injury, and, to repress swelling, his attending physician ordered that Welch be given the maximum therapeutic dose of a drug called Decadron, a cortico-steroid that is used as an anti-inflammatory agent. The Physician's Desk Reference states that Decadron has several adverse side effects, including euphoria, insomnia, mood swings, personality changes, severe depression, and in extreme cases, "frank psychotic manifestations." Physician's Desk Reference (51 Ed.1997) 1681. The PDR also warns that the drug must be withdrawn from the body gradually. *Id.* at 1682. Near the end of Welch's ten-day hospitalization, he began to experience some indicia of psychosis, disorganized thinking and paranoia. After discharge, the attending physician did not prescribe any further doses of Decadron, so the drug was immediately withdrawn from Welch.

On the third day after being discharged, Welch experienced a psychotic break with reality. He ran out of his house and down the street in the direction of a local mental health center, but he never arrived. Voices in his head told him to enter a stranger's house where, after struggling with the occupants, Welch stabbed a teenage boy to death. Police apprehended him a short time later in

another home where he sat at the dining room table babbling uncontrollably. At first Welch was jailed, but when he again suffered a psychotic break from reality and attacked a fellow prisoner, he was transferred to ·a psychiatric hospital. Welch was later found to be not guilty of the murder by reason of insanity. He had no previous history of mental illness.

The Portage County Court of Common Pleas held a subsequent hearing pursuant to R.C. 2945.40 and 5122.15 and adjudicated Welch to be a mentally ill person subject to hospitalization by court order. On July 13, 1988, the court confined him to the Timothy B. Moritz Center in Toledo, Ohio.

According to R.C. 5122.15(H), the trial court is required to conduct a mandatory hearing every two years to review the ill person's progress. In fact, R.C. 5122.15(H) requires that the patient be discharged unless the prosecuting attorney or the Attorney General files an application to continue the commitment for another two years. Upon his first two-year review hearing in 1990, Welch was again adjudicated to be a mentally ill person subject to court-ordered hospitalization. On May 12, 1990, Welch was transferred to the Northwest Psychiatric Hospital (also in Toledo, Ohio) as the least restrictive environment.

Upon his second two-year review in 1992, Welch was again found to be mentally ill, but no longer subject to hospitalization. On April 28, 1992, he was conditionally released from Northwest, but was subsequently arrested by Toledo police officers for possession of marijuana, and the conditional release was revoked.

Commitment at Northwest was continued after the third two-year review in 1994.

In order to initiate the fourth two-year review, the prosecutor filed another application for continued commitment on February 23, 1996, and a report from Robert Carr, M.A., a psychologist and forensic examiner at Northwest. Also, Carr and Dr. Thresieamma Jacob, M.D., a psychiatrist who leads Welch's treatment team, both testified by deposition regarding Welch's mental state. Based on the report and the testimony of the expert witnesses, the trial court granted the state's application for continued commitment on January 22, 1997. As this order is final, R.C. 5122.15(K), Welch appealed. He asserts one assignment of error:

"The trial court erred in finding that the burden of proof had been met and finding that appellant is a mentally ill person subject to hospitalization."

Welch was acquitted of·the murder and cannot be punished for this crime. *Jones v. United States* (1983), 463 U.S. 354, 369, 103 S.Ct. 3043, 3052, 77 L.Ed.2d 694, 708. Yet those who have committed violent crimes while legally insane and who are still mentally ill at the time of trial pose a continuing risk to society or to

themselves. Confining them in mental institutions serves to protect society while at the same time subjecting the patients to treatment in the hope that one day they will be cured. However, the state must meet a heavy burden to show that an individual suffers from a mental illness and must be confined against his will. The statutes provide an elaborate three-part definition of legal insanity, which the state must fulfill to have a person involuntarily committed. The first two parts can be found in R.C. 5122.01(A), which states:

" 'Mental illness' means a substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life."

First, there must be a "substantial" disorder of (1) thought, (2) mood, (3) perception, (4) orientation, or (5) memory. Words in a statute are to be given their common, ordinary meaning. *State v. Hix* (1988), 38 Ohio St.3d 129, 131, 527 N.E.2d 784, 786–787. Webster's Third New International Dictionary (1986) 2280 defines the adjective "substantial," in pertinent part,[1] as: "3a: having good substance: firmly or stoutly constructed: STURDY, SOLID, FIRM * * * b: having a solid or firm foundation: soundly based: carrying weight < a ~ argument> < ~ evidence>."

The second part of the definition of "mental illness" in R.C. 5122.01(A) is that, once there is established a "substantial" disorder of thought, mood, perception, orientation, or memory, it must also be shown that this disorder "grossly" impairs (1) judgment, (2) behavior, (3) capacity to recognize reality, or (4) ability to meet the ordinary demands of life. Webster's Third, *supra*, at 1002, gives the definition of the adverb "grossly" as "in a gross manner." The word "gross" is defined as "glaringly noticeable" and "FLAGRANT." *Id.*

The third part of the combined definition is found in R.C. 5122.01(B), under which a person who has a "substantial" mental disorder that "grossly" impairs his functioning is subject to court-ordered hospitalization only if he:

"(1) Represents a substantial risk of physical harm to himself as manifested by evidence of threats of, or attempts at, suicide or serious self-inflicted bodily harm;

---

1. Another definition of "substantial" is given as "1a: consisting of, relating to, sharing the nature of, or constituting substance: existing as or in substance: MATERIAL * * * b: not seeming or imaginary: not illusive: REAL, TRUE * * * c: being of moment: IMPORTANT, ESSENTIAL * * *." Webster's Third New International Dictionary (1986) 2280. According to this sense of the word, the state would only have to prove that the allegedly ill person suffers from a real, not illusive or imaginary, disorder. We reject this construction because R.C. 5122.01(A) should be strictly construed against the state and this aspect of the definition imposes too light a burden upon those seeking to deprive someone of their liberty. Instead, we adopt the latter part of the definition, which entails a showing that the disorder is not merely real or non-illusory, but a further showing that it bears significant weight.

"(2) Represents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of present dangerousness;

"(3) Represents a substantial and immediate risk of serious physical impairment or injury to himself as manifested by evidence that he is unable to provide for and is not providing for his basic physical needs because of his mental illness and that appropriate provision for such needs cannot be made immediately available in the community; or

"(4) Would benefit from treatment in a hospital for his mental illness and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or himself."

In summary, the state must prove (1) the defendant has a "substantial" mental disorder, (2) the mental disorder "grossly" impairs his functioning, and (3) the defendant should be hospitalized for one of the four reasons given in R.C. 5122.01(B). Clear and convincing evidence must be presented on each of these three points. R.C. 5122.15(H).

"Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118, paragraph three of the syllabus.

"Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel* (1990), 55 Ohio St.3d 71, 74, 564 N.E.2d 54, 60.

Both Dr. Jacob and Carr testified that Welch no longer experiences any hallucinations [2] and shows no signs of the active psychosis that caused him to stab the boy in 1987. In fact, his psychotic episodes completely disappeared shortly after the incident. They also said he does not currently suffer from any disorder of perception, orientation, or memory.

Although they further testified that Welch does not suffer from a substantial disorder of thought, they diagnosed him as having an antisocial personality disorder. Carr, in his report, elaborated in these terms:

---

2. Welch reported hearing "voices" recently, but upon investigation, Dr. Jacob concluded that he was simply misinterpreting his own feelings of remorse and that he did not experience a true hallucination. Carr concurred.

"Mr. Welch as has been consistently noted does have a well-documented Antisocial Personality Disorder * * *. His personality structure represents a relatively fixed lifestyle, attitude and behavioral pattern which clinical experiences indicates [sic] is highly resist[ant] to change by traditional therapies and is unlikely to be modified by inpatient psychiatric hospitalization."

The Diagnostic and Statistical Manual of Mental Disorders (1994 Ed.) (the "DSM–IV"), which is published by the American Psychiatric Association, describes antisocial personality disorder as follows:

"The essential feature of Antisocial Personality Disorder is a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood.

" * * *

"For this diagnosis to be given, the individual must be at least 18 years (Criterion B) and must have had a history of some symptoms of Conduct Disorder before age 15 years (Criterion C). Conduct Disorder involves a repetitive and persistent pattern of behavior in which the basic rights of others or major age-appropriate societal norms or rules are violated. The specific behavior characteristic of Conduct Disorder fall into one of four categories: aggression to people and animals, destruction of property, deceitfulness or theft, or serious violation of rules. * * *

"The pattern of antisocial behavior continues into adulthood. Individuals with Antisocial Personality Disorder fail to conform to social norms with respect to lawful behavior (Criterion A1). They may repeatedly perform acts that are grounds for arrest (whether they are arrested or not), such as destroying property, harassing others, stealing, or pursuing illegal occupations. Persons with this disorder disregard the wishes, rights, or feelings of others. They are frequently deceitful and manipulative in order to gain personal profit or pleasure (e.g., to obtain money, sex, or power) (Criterion A2). They may repeatedly lie, use an alias, con others, or malinger. A pattern of impulsivity may be manifested by a failure to plan ahead (Criterion A3). Decisions are made on the spur of the moment, without forethought, and without consideration for the consequences to self or others; this may lead to sudden changes of jobs, residences, or relationships. Individuals with Antisocial Personality Disorder tend to be irritable and aggressive and may repeatedly get into physical fights or commit acts of physical assault (including spouse beating or child beating) (Criterion A4). Aggressive acts that are required to defend oneself or someone else are not considered to be evidence for this item. These individuals also display a reckless disregard for the safety of themselves or others (Criterion A5). This may be evidenced in their driving behavior (recurrent speeding, driving while intoxicated, multiple acci-

dents). They may engage in sexual behavior or substance use that has a high risk for harmful consequences. * * *

"Individuals with Antisocial Personality Disorder also tend to be consistently and extremely irresponsible (Criterion A6). Irresponsible work behavior may be indicated by significant periods of unemployment despite available job opportunities, or by abandonment of several jobs without realistic plan for getting another job. There may also be a pattern of repeated absences from work that are not explained by illness either in themselves or in their family. Financial irresponsibility is indicated by such acts as defaulting on debts, failing to provide child support, or failing to support other dependents on a regular basis. Individuals with Antisocial Personality Disorder show little remorse for the consequences of their acts (Criterion A7). They may be indifferent to, or provide a superficial rationalization for, having hurt, mistreated, or stolen from someone (e.g., 'life's unfair,' 'losers deserve to lose,' or 'he had it coming anyway'). These individuals may blame the victims for being foolish, helpless, or deserving their fate; they may minimize the harmful consequences of their actions; or they may simply indicate complete indifference. They generally fail to compensate or make amends for their behavior. They may believe that everyone is out to 'help number one' and that one should stop at nothing to avoid being pushed around." DSM–IV at 645–646.

True to this description, the experts called Welch "manipulative." Carr gave the following explanation and anecdote:

"Well, first of all, [you] have to qualify, all of us are manipulative in one way or another. I think it has a pathological impact when basically its used consistently in order to get your way in the hospital * * *.

"A good example I think was the situation where Mr. Welch wanted to change his room, and he approached one of the nurses and said, you know, I want to change my room. I don't remember what the reason was, but the nurses said, no, we don't have a vacancy right now, so we'll have to—you'll have to remain in your room. So he went to a second and third shift, [until] he finally found a nurse who was willing to move him.

"The change in [and of it]self may not have been a problem, but the reason for changing, may have been omnifarious from what we're suspecting at this point."

Also, the experts testified that Welch had been involved in several altercations with other patients but it turned out that he was not the aggressor, and that in one incident he was defending himself against another inmate who was out of control.

As a further incident to the personality disorder, Welch told Carr on past occasions that he enjoys smoking marijuana, that it does not cause him harm, and

that he could do it as long as he wants. Welch also has a history of abusing alcohol and marijuana since he was six years old and a record of driving under the influence of alcohol. While on conditional release in 1993, Welch was arrested for possessing marijuana, which caused his conditional release to be revoked. On January 3, 1996, hospital staff discovered the remains of a marijuana cigarette in Welch's room during a routine search. His next urinalysis test on January 12, 1996 indicated the presence of marijuana. Carr said:

"Basically, a person with an antisocial personality disorder does not abide by the same rules [as] everybody else. They have a tendency to find themselves above the law in that sense, so if they want to engage in alcohol, if they want to drive their car above the speed limit, you know, a lot of minor type of things[,] [they will] * * *.

" * * *

"The other thing is it's common use of drugs and the attitude that's associated with that. You know, I like marijuana, I don't think it bothers me, I don't think it's harmful, so I'm going to go ahead and use marijuana as long as I want. It's an attitude sort of thing."

Accordingly, the experts diagnosed Welch as suffering from Alcohol Abuse Disorder and Cannabis Abuse Disorder. See DSM–IV at 182 for a description of substance abuse disorders generally.

Welch's persistent desire to use drugs is also offered as evidence of impaired judgment and lack of consideration of the consequences of his behavior. His arrest in 1993 caused the revocation of his conditional release. Also, when the authorities found the marijuana cigarette in Welch's room, he was very close to earning another conditional release. Despite the consequences, Welch used drugs, was caught by a drug screening test, and lost all of his privileges, including his progress toward another conditional release.[3]

Notwithstanding these indicators of Welch's unusual thinking on the subject of conforming his conduct to the standards of behavior that society expects and the law demands, the experts resisted the idea that he suffers from a "disorder of thought" as understood by the statute. Carr stated: "I don't see [antisocial personality disorder] as a major mental illness, no * * * " and described Welch's problem as one of "impulse control."

---

3. Welch was infuriated because a urinalysis test on that same date administered by an external drug rehabilitation service indicated no marijuana was present. He wanted to confront the hospital technician who performed the urinalysis test. He confronted hospital security officers, accusing them of tampering with the results. Dr. Jacob opined that this reaction was a sign that Welch deflected the blame for his predicament onto everyone but himself.

However, the hypertechnical distinction between acting on impulse and abnormal thinking was forcefully rejected in the case *In re McKinney* (1983), 8 Ohio App.3d 278, 8 OBR 371, 456 N.E.2d 1348. There, McKinney was found to be incompetent to stand trial for murder, several rapes, and numerous acts of arson. The experts testified that McKinney suffered from mild mental retardation and antisocial personality disorder. They described McKinney's disorder as manifesting itself by poor judgment, impulsiveness, inability to differentiate between right and wrong, a lack of guilt or remorse over his offenses, acting out regardless of consequences, pyromania, and pedophilia. One psychiatrist argued that McKinney "reaches conclusions [as to his behavior] guided by impulse, rather than thinking, such as fire-setting for example, or the gross sexual acts which we described." *Id.* at 280, 8 OBR at 373, 456 N.E.2d at 1351. Judge Whiteside rejected the distinction, holding instead that the statutory term "disorder of thought" includes dysfunctions in "the act or process of thinking." *Id.* at 280–281, 8 OBR at 374, 456 N.E.2d at 1351, quoting Webster's Third New International Dictionary (1961 Ed.). Apparently, this includes surrendering to destructive impulses. The appellate court affirmed the probate court's determination that McKinney was mentally ill under the statutory definition and subject to court-ordered hospitalization.

From the *McKinney* case, we gather that an antisocial personality disorder is a "disorder of thought" and could qualify as a "mental illness" under Ohio law. It should be noted, however, that the same evidence that McKinney could not control his destructive impulses to murder, rape, and burn also established that his disorder was "substantial," that his behavior and/or judgment were "grossly impaired," and that McKinney represented a substantial risk of harm to others. All three parts of the statutory definition of a "mentally ill person subject to hospitalization by court order" under R.C. 5122.01(A) and (B) were thus met at the same time.

Contrast McKinney's case with the one at bar. As far as the evidence shows, Welch's antisocial personality disorder manifests itself by benign manipulation of hospital staff and a persistent desire to use alcohol and marijuana. We neither think this constitutes a "substantial" thought disorder nor that Welch's behavior or judgment is "grossly" impaired. Many people exhibit a persistent desire to abuse alcohol or drugs. It does not make them mentally ill. In short, Welch is no McKinney. His antisocial personality disorder and related substance abuse disorders are not severe enough to meet the definition of a "substantial" disorder of thought and do not, therefore, enable the state to keep Welch confined against his will.

The experts also diagnosed Welch as suffering from dysthymia, which is a mood disorder. See DSM–IV at 345 for a description of Dysthymic Disorder.

58

But they explained that it was "mild" or "minor," characterized by lack of energy and motivation and an inability to sleep. It is due to his prolonged confinement, frustration, and unhappiness with his life situation. Welch also feels despair over his lack of progress toward freedom and is bitter about what he considers to be differential treatment given to others who have been released before him. He thinks he is not "getting a fair shake" from the system. The experts said that this mood disorder does not grossly impair his judgment, behavior, capacity to recognize reality, or meet ordinary demands of life.[4] Neither does it require hospitalization, but could be treated on an outpatient basis. Mild dysthymia is not a "substantial" disorder of mood; nothing here gives the state the right to keep Welch confined. Tens of thousands of Ohioans are mildly depressed every day. It does not mean they should be institutionalized.

Carr aptly summarized the evidence of Welch's mental state in his report:

"As has been the case since his return to the hospital [in 1993 after conditional release was revoked], Mr. Welch's thinking was well-organized and rational with no looseness of associations, flight of ideas or blocking. There was no evidence of delusional or unusual thought processes. There was no evidence of hallucinations or other symptoms of a perceptual disturbance. There was in short no evidence to indicate that Mr. Welch has a mental disorder."

Carr even admitted on cross-examination that he would have a difficult time saying Welch met the criteria for mental illness under the statute.

Despite the lack of any evidence suggesting that Welch is at present mentally ill, the experts still expressed "concerns" about releasing him. Dr. Jacob testified:

"When [a] patient becomes anxious, because of the history of substance abuse, it is possible that in order to control his dysphoric mood or depressed mood or controlled anxiety, he may go back into taking marijuana or alcohol to control his mood and his discomfort because of the past history he had done that, he probably will do it again.

" * * * *

"[Although] he had been actively participating in substance abuse treatment for the last couple of months[,] [t]his is in a restricted environment of a hospital where he has no opportunity to be outside to obtain drugs or alcohol. The continued progress is * * * only for the past two or three months. We need to find out how he's going to use his freedom or his privileges from using alcohol or substance like he had done in the past.

---

4. There was testimony to the effect that when he was released in 1992, Welch neglected the apartment in which he was living and lost weight because he did not eat regularly.

"He needs close monitoring, somebody to supervise his activities, even if he has privileges from the hospital.

"Right now he goes to the substance abuse groups with one of the staff members and he's left with the therapist there and then he's escorted back to our facility by another staff member. So he hasn't had the opportunity to be on his own for me to determine at this time, if he would—how he would use his privileges or freedom if he's left out of the hospital.

"* * * *

"[If released] [h]e may not seek treatment, because when he was on conditional release before, he did not attend AA meetings, he did not attend substance abuse treatments. So with the past history, most of the time we had to go by what he has done in the past. We don't know what he will do, so that would be my concern that he may not seek treatment voluntarily if somebody do[es] not supervise him.

"* * * *

"At this time, my recommendation will be for continued commitment until we have a chance to make sure that the patient is able to utilize his privileges and freedom out of the hospital appropriately without alcohol or any substance abuse."

Carr offered this connection between drug use and Welch's antisocial personality as a source of concern:

"I think if you take a person who, because of his personality structure, who already has problems with impulse control and faulty judgment, when that person uses chemicals that are mind-altering, they can substantially exacerbate that impaired judgment and lead to very serious consequences."

Dr. Jacob further observed that "[b]ecause of his past history of violence [the murder] and also his continued use of substance, even in [a] restricted environment, I will have some concerns about his *potential* violence [to other people]." (Emphasis added.)

■  To some extent, these concerns are legitimate. But continuing to confine a person suffering from an antisocial personality disorder who does not meet the statutory definition of mental illness on the ground that he may be dangerous violates due process. *Foucha v. Louisiana* (1992), 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437. Should Welch abuse alcohol, traffic in marijuana, or commit an assault or other violent crime when released, it will be a matter for law enforcement officials, not the mental health community. *Id.* at 82, 112 S.Ct. at 1786–1787, 118 L.Ed.2d at 449–450.

The reluctance of the psychologists and the trial court to release Welch is understandable. Their decision to keep him confined insulates them from potential criticism should he injure someone else after being released. Perhaps they are right that we would all be a little safer if he were kept in a mental institution. Yet our duty to enforce every individual's constitutional rights requires that we order his release.

The judgment of the Portage County Court of Common Pleas is therefore reversed, and it is the order of this court that the defendant-appellant, Joseph "Friday" Welch, be immediately and unconditionally discharged. *State v. Gladding* (Mar. 26, 1993), Lake App. No. 92–L–117, unreported, 1993 WL 150463.

*Judgment reversed*
*and defendant discharged.*

WILLIAM M. O'NEILL and CACIOPPO, JJ., concur.

MARY CACIOPPO, J., retired, of the Ninth Appellate District, sitting by assignment.