OPINION
In this accelerated calendar case, submitted on the record and briefs of the parties, appellant, Melinda J. Allison, appeals the judgment of the Trumbull County Court of Common Pleas granting summary judgment in favor of appellee, Douglas L. Johnson.
The following facts gave rise to this present matter. On the evening of October 16, 1999, appellant was a passenger in a vehicle driven by appellee. Appellee stopped at his property to water his horses while appellant remained in the vehicle. After waiting for a few minutes, appellant exited the vehicle and proceeded towards the barn. When appellant attempted to communicate with appellee, who was inside the barn, she continued to wait until she saw appellee come out of the arena leading a horse. This arena is located off the side of the barn.
Appellant was surprised to see appellee leading a horse out of the arena because she knew that the horses were kept in stalls. Appellee led the horse from the arena into the barn and towards appellant. As appellee turned around to shut the gate, which separated the barn and the arena, he also turned the horse around. However, the horse began to jump and shuffle backwards towards appellant. Appellee tried to hold the horse, but despite his efforts, the horse began pulling him. During this time, appellant understood that appellee was attempting to gain control of the horse, but was unable to do so.
As appellant attempted to step backwards and turn, the horse backed into a gate constructed of 2x4 boards which appellee placed in brackets. Consequently, the board popped out of a bracket and struck appellant in the face, causing serious injuries. Prior to the accident, appellant indicated that she was watching appellee lead the horse.
As a result of these events, on February 17, 2000, appellant filed a complaint in the Trumbull County Court of Common Pleas asserting two causes of action against appellee. First, appellant claimed that appellee negligently failed to properly restrain his horse, which was owned and stabled in a barn on his property. Second, appellant alleged that appellee was negligent in the design, construction and upkeep of his premises, failed to maintain his premises in a reasonably safe condition, and failed to warn appellant of the dangerous condition which existed on the premises or to make the premises reasonably safe.
In response to appellant's complaint, appellee filed an answer wherein he admitted that an accident occurred on October 16, 1999, on his property involving appellant and a horse owned by him. However, appellee denied that he was guilty of any negligence proximately causing the accident. Instead, appellant raised the defense of equine immunity pursuant R.C. 2305.321(B)(1), which provides an equine activity sponsor with immunity from tort liability for harm sustained by an equine activity participant during equine activity.
Subsequently, on June 28, 2000, appellee filed a motion for summary judgment arguing that because equine immunity applied, appellant could not prevail as a matter of law. According to appellee, he was entitled to immunity from liability with regards to appellant's claims because: (1) the transporting of the horse back to his stall constituted "equine activity;" (2) appellant was an "equine activity participant" at the time of the incident because she was watching appellee tend to the horse; and (3) appellee was an "equine activity sponsor" because he was the owner of the horse and owner of the property where the stable was located.
Attached to the motion for summary judgment was appellee's affidavit wherein he averred that he was the owner of the property on which appellant was a social guest, and that he had owned the horse for only two weeks before the accident occurred. According to appellee, he was attempting to get the horse into a stall because the horse had escaped sometime prior to the accident. While he was attempting to lead the horse into the stall, the horse "became scared and bolted backwards, into the board[,]" which popped out of its bracket and struck appellant in the face.[1] Furthermore, appellee stated the horse never escaped from the stall before, and that in the two weeks prior to the accident, he had never known the horse to be "prone to bolt under any circumstances."
On August 24, 2000, appellant filed a response to appellee's motion for summary judgment setting forth two theories. First, appellant asserted that appellee lacked equine immunity because she was not an equine activity participant. According to appellant, she did not exit the truck and position herself near the barn with the specific purpose of being a spectator while appellee tended to his horse. Instead, appellant was merely attempting to locate appellee.
Second, appellant maintained that a genuine issue of material fact existed as to whether appellee was negligent in the design, construction and upkeep of his premises. To support her contention, appellant provided the affidavit of Ronald Cornell Faniro ("Mr. Faniro"), an architect. In this affidavit, Mr. Faniro stated that the floor joist hangers used by appellee in constructing the barn gate were used "in a manner not intended or anticipated by their manufacturer, nor in a manner that would constitute good and acceptable building or architectural practices * * *." Mr. Faniro further indicated that "as a direct result of the improper use of the floor joist hangers, the 2x4 plank of wood bent, deflected and came out of the floor joist hanger when the load was applied by the horse, resulting in the injury to [appellant]."[2]
Upon considering these motions, the trial court granted summary judgment in favor of appellee without reason. It is from this judgment appellant appeals, asserting two assignments of error for our consideration:
 "[1.] The lower court erred in granting defendant's summary judgment motion since plaintiff was not a spectator of an equine activity as defined by ORC Section 2305.321[.]
 "[2.] The lower court erred in granting defendant's summary judgment since defendant's use of a makeshift barn gate forfeits immunity pursuant to ORC Section 2305.321(B)(2)(c)[.]"
 Before addressing the merits of appellant's first assignment of error, we will lay out the appropriate standard of review. In reviewing a trial court's entry of summary judgment, an appellate court employs the same Civ.R. 56(C) standard as the trial court. Drawl v. Cornicelli (1997), 124 Ohio App.3d 562, 566. Thus, an appellate court reviews a trial court's decision on a motion for summary judgment de novo. Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105.
Under Ohio law, summary judgment is appropriate when: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can reach only one conclusion, which is adverse to the party against whom the motion is made, such party being entitled to have the evidence construed most strongly in his favor. Civ.R. 56(C); Mootispaw v. Eckstein (1996),76 Ohio St.3d 383, 385; Leibreich v. A.J. Refrigeration, Inc. (1993),67 Ohio St.3d 266, 268; Bostic v. Connor (1988), 37 Ohio St.3d 144,146.
A party seeking summary judgment on the grounds that the nonmoving party cannot prove its case bears the initial burden of informing the trial court of the basis for the motion and of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claim. Dresherv. Burt (1996), 75 Ohio St.3d 280. Accordingly, the moving party must specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claim. Id. If the moving party satisfies its initial burden under Civ.R. 56(C), the nonmoving party has the burden to respond, by affidavit or as otherwise provided in the rule, so as to demonstrate that there is a genuine issue of fact. Id. However, if the nonmoving party fails to do so, then the trial court may enter summary judgment against that party. Id.
Now we consider appellant's first assignment of error. In general, appellant argues that equine immunity is not available to appellee because at the time appellant was injured by the horse, she was not a "spectator" of any equine activity as the term is used in R.C. 2305.321(A)(3)(g). Instead, appellant suggests that she was merely a bystander.
In examining statutory language, a court's paramount concern is legislative intent. State v. S.R. (1992), 63 Ohio St.3d 590, 595. The words and phrases contained in Ohio's statutes are to be given their plain, common, ordinary meaning and are to be construed "according to the rules of grammar and common usage." R.C. 1.42. See, also, Kunkler v.Goodyear Tire Rubber Co. (1988), 36 Ohio St.3d 135, 137; State v.Welch (1997), 125 Ohio App.3d 49, 52, citing State v. Hix (1988),38 Ohio St.3d 129, 131.
Although the effective date of R.C. 2305.321 was March 3, 1997, relatively no case law exists in Ohio as to the application of equine immunity. Hence, we begin at the beginning.
In viewing this statute, it is apparent that there is a single broad purpose which is set out fairly explicitly. That purpose is to declare that certain named equine persons as well as any "other person [are] not liable in damages in a tort or other civil action for harm that an equine activity participant allegedly sustains during an equine activity and that results from an inherent risk of an equine activity." R.C.2305.321(B)(1).[3]
Further, the premise for that purpose is also quite clear. That premise is the acknowledgement in R.C. 2305.321(A)(7) that there is an "[i]nherent risk of an equine activity" as "a danger or condition that is an integral part of an equine activity, including, but not limited to, any of the following:
 "(a) The propensity of an equine to behave in ways that may result in injury, death, or loss to persons on or around the equine;
 "(b) The unpredictability of an equine's reaction to sounds, sudden movement, unfamiliar objects, persons, or other animals[.]"
 Before we may apply the statute to the case at hand, we must examine a number of terms. For instance, the statute defines "equine activity" as including:
"* * *
 "(iii) The boarding of an equine, including, but not limited to, normal daily care of an equine[.] (Emphasis added.) R.C. 2305.321(A)(2)(a)(iii).
 Frankly, there is little of the day to day maintenance and routine of keeping a horse that could not fall under this penumbra. Certainly, the retrieval of a loose horse from the arena area to the stall area would be part and parcel of such equine activity. Further, such activity would seem to be exactly what was contemplated when the legislature spoke of the "unpredictability" which accompanies equine activity.
Additionally, under R.C. 2305.321(A)(4)(b), an "equine activity sponsor" is "[a]n operator or promoter of, or an instructor at, an equine facility, such as a stable, clubhouse, pony ride, fair, training facility, show ground, or arena at which an equine activity is held." (Emphasis added.) Here, appellee is an equine activity sponsor because he was the operator of the stable and arena where the equine activity took place.
Having said that, we look to the arguments raised under the first assignment of error. The precise issue raised by appellant is whether appellant was a "spectator" of equine activity. R.C. 2305.321(A)(3) provides that an "equine activity participant" is "a person who engages in any of the following activities, regardless of whether the person is an amateur or a professional or whether a fee is paid to participate in the particular activity: * * * (g) Being a spectator at an equine activity." (Emphasis added.)Appellant would have us interpret this language very narrowly and limit it to a formalized event that an individual attends for the specific purpose of being a spectator. While the statute does include formal activities such as horse shows where there is a specific audience, there is also language which goes well beyond such definitive events:
"`Equine Activity' means any of the following:
 "(i) An equine show * * * including, but not limited to * * * recreational riding;
"* * *
 "(iii) The boarding of an equine, including, but not limited to, normal daily care of an equine;
"* * *
 "(vi) A ride, trip, hunt, branding, roundup, cattle drive, or other activity that involves an equine and that is sponsored by an equine activity sponsor, regardless of whether the activity is formal, informal, planned, or impromptu[.]" (Emphasis added.) R.C. 2305.321 (A)(2)(a)
"* * *"
 As can be seen, the above section of this legislation is very broad. However, that is not inconsistent with what we have determined to be the purpose and premise of this legislation. Appellant, nevertheless, argues that the term "spectator" is limited in its application to this statute.
According to the Supreme Court of Ohio, when words are undefined by a statute, they are to be interpreted by using their usual, common, and everyday meaning. S.R. at 595; State ex rel. Celebrezze v. Allen Cty.Bd. of Commrs. (1987), 32 Ohio St.3d 24, 27. Because the term "spectator" is not specifically defined in R.C. 2305.321, we initially look to common dictionary definitions to assist in determining such meaning.
Webster's II New College Dictionary (1999) 1060 defines spectator as "[a]n observer of an event." Similarly, Webster's Third New International Dictionary (1986) 2188 provides that a "spectator" is "one that looks on or beholds; * * * one witnessing an exhibition." The Random House Dictionary, Concise Edition (1983) 840, states that a "spectator" is "a person who watched without participating."
As for appellant's assertion that she was merely a "bystander" rather than a spectator, again, we apply the common, ordinary meaning of the term "bystander" as defined by the dictionary. In doing so, we do not find this distinction to be persuasive.
In the Webster's II New College Dictionary (1999) 152, a "bystander" is "[a] witness to an event." Webster's Third New International Dictionary (1986) 307, indicates that a "bystander" is "one present but not taking part: a chance spectator[.]" The Random House Dictionary, Concise Edition (1983) 119, provides that a "bystander" is "a person present but not involved." Finally, Black's Law Dictionary (6th Ed. 1991) 139, states that a "bystander" is [o]ne who stands near; a chance looker-on; hence one who has no concern with the business being transacted. One present but not taking part, looker-on, spectator, beholder, observer." (Emphasis added.)
Thus, we see no distinction between the plain and ordinary meaning of spectator and bystander. Further, the above definitions must then be readin pari materia with the statutory definition of the equine activity most applicable in the instant case, to-wit:
 "(iii) The boarding of an equine, including, but not limited to, normal daily care of an equine[.] * * *" R.C. 2305.321(A)(2)(a)(iii).
 With this in mind, we consider the record. In particular, appellant's deposition testimony reveals that while she did not participate or help appellee lead the horse, she did admit to watching this activity take place:
 "Q. [by counsel for appellee] Were you assisting [appellee] in any way or were a spectator to what was going on?
"A. [by appellant] What do you mean?
"Q. Were you helping or were you watching?
"A. Watching."
 Thus, upon applying the common, ordinary meaning of the term spectator, it is clear that appellant was an equine activity participant by virtue of being a spectator, to-wit: an observer, watcher, or bystander to the normal daily care of an equine. Therefore, equine immunity from liability is available to appellee.
In summation, in giving effect to the common meaning of spectator and the express statutory definition of equine activity, this court holds that appellant was a spectator of equine activity as required by R.C.2305.321(A)(3)(g). Thus, the equine immunity statute is applicable to the case at hand. Appellant's first assignment lacks merit.
Turning to the second assignment of error, appellant maintains even if equine immunity applied, appellee forfeited this immunity under R.C.2305.321(B)(2)(c), which provides:
 "(2) The immunity from tort or other civil liability
conferred by division (B)(1) of this section is forfeited if any of the following circumstances applies:
"* * *
 "(c) The harm involved is proximately caused by a dangerous latent condition of the land on which or the premises at which the harm occurs, an equine activity sponsor, equine activity participant, equine professional, veterinarian, farrier, or other person owns, leases, rents, or otherwise lawfully possesses and controls the land or premises and knows or should know of the dangerous latent condition, but does not post conspicuously prior to the time of the harm involved one or more signs that warn of the dangerous latent condition." (Emphasis added.)
 According to appellant, a genuine issue of material fact exists as to whether appellee knew or should have known that the gate constructed of 2x4 boards was a dangerous condition. To support this contention, appellant points to Mr. Faniro's affidavit which indicated that the floor joist hangers used by appellee to hold the 2x4 boards were improper and that "as a direct result of the improper use of the floor joist hangers, the 2x4 plank of wood bent, deflected and came out of the floor joist hanger when the load was applied by the horse, resulting in the injury to [appellant]."
In rebuttal, appellee posits there is no evidence to suggest that he had actual or constructive knowledge of any dangerous condition on his premises. Appellee offers his affidavit to maintain his assertion:
 "The board which popped out of its bracket and struck [appellant] did not break. I have used this method of controlling horses for years and never had a horse back into the board before, and never had a board pop out of the bracket in which it was placed before." (Emphasis added.)
 First, we note that Mr. Faniro's affidavit offers little insight into this matter, except on two points: one, that the floor joist hangers were not used by appellee as intended by the manufacturer; and two, the improper use of the floor joist hangers caused the 2x4 board to come out of the floor joist hanger when the horse backed into it. Thus, appellant presented some evidence that the allegedly improper use of the floor joist hangers allowed the 2x4 board to come out after the horse backed into it. However, appellant failed to present evidence to demonstrate that appellee knew or should have known of this allegedly dangerous latent condition as required under R.C. 2305.321(B)(2)(c).
As appellee stated in his affidavit, he "never had a board pop out of the bracket * * * before." (Emphasis added.) Appellant did not rebut this assertion. Stated simply, the record before this court lacks any evidence establishing that appellee had or should have had knowledge of the allegedly dangerous condition. As such, appellant failed to satisfy her burden of creating a genuine issue of material fact in this regard. See, e.g., Hodges v. Gates Mills Tower Apt. Co. (Sept. 28, 2000), Cuyahoga App. No. 77278, unreported, at 4, 2000 WL 1429421 (holding that summary judgment was proper when plaintiffs failed to present any evidence that defendant had actual or constructive notice of mis-leveling problems with an elevator); Kennick v. B.H.K. Properties (May 19, 2000), Trumbull App. No. 99-T-0016, unreported, at 3, 2000 WL 655451 (holding that summary judgment was properly granted when the record was devoid of any evidence establishing that defendant had prior notice of problems with stairs where plaintiff fell).
Further, there was nothing in Mr. Faniro's affidavit to indicate that the condition created by the alleged improper use of the floor joist hangers was so obvious that appellee should have known of its dangerous potential. There is also nothing to dispute the obvious conclusion that if the horse had not misbehaved in an unpredictable way, the board would not have popped out of the floor joist hanger. For these reasons, appellant's second assignment of error is not well-taken.
On a final note, it appears to this court that the instant facts encompass the precise situation contemplated by the legislature. An injury occurred due to the "inherent risk of an equine activity" which was "[t]he propensity of an equine to behave in ways that may result in injury * * * to persons * * * around the equine, * * *" and "[t]he unpredictability of an equine's reaction * * * [.]" R.C.2305.321(A)(7).
However, it is virtually impossible for this court to conceive of every imaginable scenario involving this statute. Thus, we would extend the following caveat with respect to the broad parameters of immunity established by this statute. The mandate in this case should not be construed to hold that those granted immunity under this provision would be immune in all circumstances where an individual happens to see a horse and has an unfortunate physical contact with such animal or is injured as a result of a force in motion caused by such equine.
Based on the foregoing analysis, appellant's assignments of error are without merit, and the judgment of the trial court is affirmed.
 _________________________ JUDGE JUDITH A. CHRISTLEY
FORD, P.J., NADER, J., concur.
[1] Appellee was uncertain as to what caused the horse to react as he did.
[2] A reply in support of summary judgment was filed by appellee on August 25, 2000.
[3] R.C. 2305.321(B)(1), which provides equine immunity from tort liability, reads as follows:
 "Except as provided in division (B)(2) of this section and subject to division (C) of this section, an equine activity sponsor, equine activity participant, equine professional, veterinarian, farrier, or other person is not liable in damages in a tort or other civil action for harm that an equine activity participant allegedly sustains during an equine activity and that results from an inherent risk of an equine activity. Except as provided in division (B)(2) of this section and subject to division (C) of this section, an equine activity participant or the personal representative of an equine activity participant does not have a claim or cause of action upon which a recovery of damages may be based against, and may not recover damages in a tort or other civil action against, an equine activity sponsor, another equine activity participant, an equine professional, a veterinarian, a farrier, or another person for harm that the equine activity participant allegedly sustained during an equine activity and that resulted from an inherent risk of an equine activity." (Emphasis added.)