OPINION
{¶ 1} Respondent-appellant, L.G., appeals from a judgment of the Franklin County Court of Common Pleas, Probate Division, that overruled appellant's objections to the magistrate's April 7, 2006 decision, and affirmed said decision. The magistrate found appellant to be a mentally ill person subject to court-ordered hospitalization.
 {¶ 2} The record establishes that on April 3, 2006, L.G. was admitted to Twin Valley Behavioral Health — Columbus Campus ("TVBH-CC") on an emergency admission. L.G. was brought to TVBH-CC after the Columbus police found her dressed in inappropriate clothing and attempting to direct traffic by waving a stick at it as it went by. L.G. became argumentative and physically resistive when police insisted that she leave.
 {¶ 3} On April 7, 2006, a probate court magistrate conducted a civil commitment hearing. Based on evidence presented during the hearing, the magistrate found that appellant was mentally ill and subject to court-ordered hospitalization under R.C.5122.01(B)(3) and 5122.01(B)(4). The magistrate ordered that L.G. be committed to TVBH-CC for a period not to exceed 90 days. Appellant timely filed objections to the magistrate's decision, but did not specify any particular reason to reverse or modify the magistrate's findings. The probate court overruled appellant's objections, adopted the magistrate's decision, and found by clear and convincing evidence that appellant is a mentally ill person subject to court-ordered hospitalization pursuant to R.C. 5122.01(B)(3) and 5122.01(B)(4).
 {¶ 4} On appeal, appellant brings the following two assignments of error for our review:
FIRST ASSIGNMENT OF ERROR:
THE TRIAL COURT'S DECISION TO COMMIT THE APPELLANT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
SECOND ASSIGNMENT OF ERROR:
APPELLANT WAS PREJUDICED AT THE TRIAL COURT LEVEL BY INEFFECTIVE ASSISTANCE OF COUNSEL.
 {¶ 5} At the outset, we recognize that an involuntary civil commitment of a person constitutes a significant deprivation of liberty and requires due process protection. Addington v. Texas
(1979), 441 U.S. 418, 425, 99 S. Ct. 1804; In re Burton (1984),11 Ohio St.3d 147, 151; In Re Miller (1992), 63 Ohio St.3d 99,101. "R.C. Chapter 5122 sets forth specific procedures to be followed when a person is committed to a mental hospital, whether voluntarily or involuntarily. When commitment is against a person's will, it is particularly important that the statutory scheme be followed, so that the patient's due-process rights receive adequate protection." Id. Moreover, when a person faces commitment to a mental hospital against his or her will, the individual's right against involuntary confinement depriving him or her of liberty must be balanced against the state's interest in committing those who are mentally ill and who pose a continuing risk to society or to themselves. Id.; In the Matterof T.B., Franklin App. No. 06AP-477, 2006-Ohio-3452, ¶ 5.
 {¶ 6} As explained in In the Matter of T.B., confining mentally ill persons who are adjudged to be a risk to society or to themselves serves to protect society while at the same time provides treatment in the hope that one day those individuals will be cured. However, the state must meet a heavy burden to show that an individual suffers from a mental illness and must be confined against his or her will. Id. at ¶ 6, citing State v.Welch (1997), 125 Ohio App.3d 49, 52; R.C. 5122.01(A).
 {¶ 7} Under Ohio law there is a three-part test for an involuntary commitment. In the Matter of T.B., ¶ 7. Each part of this test must be established by clear and convincing evidence. Id. The first two parts of the test are found in R.C.5122.01(A). First, there must be a substantial disorder of thought, mood, perception, orientation, or memory. Second, the substantial disorder of thought, mood, perception, orientation, or memory, must grossly impair judgment, behavior, capacity to recognize reality, or the ability to meet the ordinary demands of life. Id.; R.C. 5122.01(A).
 {¶ 8} The third part of the test requires that the mentally ill person be hospitalized for one of the reasons set forth in R.C. 5122.01(B). Id. This statute provides:
(B) "Mentally ill person subject to hospitalization by court order" means a mentally ill person who, because of the person's illness:
(1) Represents a substantial risk of physical harm to self as manifested by evidence of threats of, or attempts at, suicide or serious self-inflicted bodily harm;
(2) Represents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of present dangerousness;
(3) Represents a substantial and immediate risk of serious physical impairment or injury to self as manifested by evidence that the person is unable to provide for and is not providing for the person's basic physical needs because of the person's mental illness and that appropriate provision for those needs cannot be made immediately available in the community; or
(4) Would benefit from treatment in a hospital for the person's mental illness and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or the person.
 {¶ 9} Under R.C. 5122.01(B), a person subject to hospitalization must represent a substantial risk of physical harm to himself or others at the time of the commitment hearing. "The individual's present mental state must be evaluated upon current or recent behavior as well as prior dangerous propensities of the person." Burton, supra, at 149. The General Assembly has provided the trial court with broad discretion to review the individual's past history in order to make a well-informed determination of his or her present mental condition. Id. Consistent with this broad discretion, the Supreme Court of Ohio has instructed trial courts to apply a "totality of the circumstances" test in determining whether a person is subject to hospitalization under R.C. 5122.01(B). This test balances the individual's right against involuntary confinement in deprivation of his or her liberty, and the state's interest in committing the emotionally disturbed. Id.
Factors which are to be considered by the court in a commitment hearing include, but are not limited to, the following: (1) whether, in the court's view, the individual currently represents a substantial risk of physical harm to himself or other members of society; (2) psychiatric and medical testimony as to the present mental and physical condition of the alleged incompetent; (3) whether the person has insight into his condition so that he will continue treatment as prescribed or seek professional assistance if needed; (4) the grounds upon which the state relies for the proposed commitment; (5) any past history which is relevant to establish the individual's degree of conformity to the laws, rules, regulations and values of society; and (6) if there is evidence that the person's mental illness is in a state of remission, the court must also consider the medically suggested cause and degree of the remission and the probability that the individual will continue treatment to maintain the remissive state of his illness should he be released from commitment.
In re Burton at 149-150.
 {¶ 10} The trial court may also consider other relevant evidence in making an informed decision about the person's present mental condition. In the Matter of T.B., ¶ 9.
 {¶ 11} Appellant does not contest the trial court's finding regarding the first two parts of the statutory test (i.e., that appellant has a substantial mental disorder that grossly impairs his functioning). However, appellant contends that the trial court's finding that appellant poses a substantial and immediate danger to herself as manifested by evidence and that she is unable to provide for her basic needs because of her mental illness under R.C. 5122.02(B)(3) and 5122.01(B)(4), was against the manifest weight of the evidence. We disagree.
 {¶ 12} "It is well-established that `judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.'" In theMatter of T.B., ¶ 11, quoting Security Pacific Natl. Bank v.Roulette (1986), 24 Ohio St.3d 17, 20, citing C.E. Morris Co.v. Foley Constr. Co. (1978), 54 Ohio St.2d 279. Here, there is competent, credible evidence supporting the trial court's finding under a clear and convincing standard, that appellant is a mentally ill person who because of her illness, represents a substantial risk of physical harm to herself under R.C.5122.01(B)(3), and who is in need of hospital treatment as manifested by evidence of behavior that creates a grave and imminent risk to the substantial rights of others under R.C.5122.01(B)(4).
 {¶ 13} At the beginning of the commitment hearing, the magistrate began to inform appellant of her rights. When appellant began interrupting and was unable to cooperate with court decorum, the magistrate had appellant removed. The following exchange occurred:
[The Court]: I'm a Magistrate. I've been appointed by the Franklin County Probate Judge to preside over this hearing. As a Respondent, you have certain legal rights.
[Appellant]: I'm hot.
[The Court]: You have a right to legal counsel.
[Appellant]: I'm hot.
[The Court]: Mr. Bonasera has been appointed to represent you. He's an experienced attorney in these matters.
[Appellant]: I'm hot.
[The Court]: You have the right to request an independent expert evaluation. If you make that request, the hearing will be continued.
[Appellant]: I'm not going to say anything.
[The Court]: You have the right to be present at your hearing. You are here. You have the right to present and cross-examine witnesses. You have the right to testify on your own behalf, but no one can compel you to testify if you do not wish to.
[Appellant]: Why won't he listen to me?
[The Court]: You also have the right to request a voluntary admission to this hospital, in which case there would be no hearing —
[Appellant]: Does he ever listen?
[The Court]: — and no potential for a ruling of involuntary hospitalization. Do you understand your rights?
[Appellant]: No. I'm hot.
* * *
[Appellant]: I'm not going to say anything for you. Okay. Let's continue it until January 1, 2007. I'm hot.
[The Court]: Mr. Belinky, do you have anything in opening?
[Appellant]: Who's he?
* * *
[The Court]: Mr. Belinky, your first witness.
Mr. Belinky: I'd like to call Dr. Bates.
[Appellant]: What's his certification?
Mr. Belinky: Your Honor, before I call Dr. Bates, I'd like —
[Appellant]: I'm hot.
Mr. Belinky: — the Court to warn the Respondent if she interrupts we'd ask that she be removed.
[Appellant]: I have to go pee. I have to piss. I have to urinate.
[The Court]: [L.G.] you're going to need to be quiet until it's your opportunity to be heard or you will be removed from the courtroom.
[Appellant]: They didn't want me to urinate before I came down here, so I'll just pee on the floor.
(Tr. at 4-7.)[1]
 {¶ 14} William Bates, M.D., was the only witness to testify at the commitment hearing. Dr. Bates is a psychiatrist, and appellant, through counsel, stipulated to Dr. Bates' qualifications, in addition to the authenticity and admissibility of medical records. Dr. Bates testified that he had an opportunity to examine appellant, review her chart from the hospital, and observe her conduct in the courtroom prior to her being removed from the hearing. On direct examination, Dr. Bates testified as follows:
Q. * * * are you able to, this morning, give psychiatric testimony to a reasonable degree of medical certainty concerning her present psychiatric condition?
A. Yes.
Q. And you also, Doctor, had an opportunity to observe her in the court prior to her being removed from the hearing?
A. Yes, I did. I was present during that period.
Q. Just real briefly, before I ask you for findings, is that, her conduct, was that consistent with how you found her when you tried to interview her the other day?
A. Very much so.
Q. But, despite that, you're still able — you're comfortable giving psychiatric testimony regarding her condition?
A. Yes. I think it just reinforces the history and clinical interview I had.
Q. Could you relate your findings, briefly, to this Court?
A. Yes. The patient has a longstanding severe psychiatric illness. She has a bipolar disorder. And when you combine that with her tendency to deny her illness, the lack of insight and refusal to take medications as an outpatient or an inpatient — she wasn't taking anything prior to coming in and she refuses to take anything at this point. So, she's essentially unchanged since her admission.
She has a disturbance of thought and mood. Her thought is completely disorganized. She is unable to really carry out any kind of logical thought.
She has all sorts of delusions. For instance, she wants to hire her own attorney but she has been evicted. She's homeless. She has absolutely no resources and she has no real hope of getting any.
She was brought here after coming to the attention of police. She was standing in traffic * * * in a red checked nightgown, pulled over her clothes, and she was waving a stick at traffic as it went by.
* * *
Since then, she's exhibited complete resistance towards treatment in the hospital. She's internally preoccupied with a mood and thought disorder. She refused to talk a lot, saying "I'm in litigation," or, "I don't talk to professionals." When I spoke with her she said, "I don't talk to mentally ill people."
She's been making statements to the staff, as we saw in here, about preoccupation with her urinary function. She was telling everybody at one point to "do a kegel exercise and pee just a little bit."
She claimed to be a Mongoloid but yet be smarter than everyone else. She said that she was raped by Bin Laden, but that she slept with him the night before. And a few days ago she woke up in the middle of the night saying, "Help, help, Osama has given me a charlie horse."
So her thinking is very disorganized and I think she's incapable of taking care of herself right now.
Q. The perception and thought disorder, it is substantial, in your professional opinion?
A. Very much so.
Q. And do you believe she represents a substantial risk of harm to herself or others as a direct result of her mental illness?
A. Well, I think both actually. She just thinks people aren't paying attention to her. She's waving sticks in traffic. Somebody actually assaulted her because of her intrusiveness.
Q. She obviously can't take care of her basic physical needs?
A. No. She's been evicted. She's homeless. She has no resources and she has no place to go.
Q. And she has no insight also.
A. She seems to lack that.
(Tr. at 13-18.)
 {¶ 15} Appellant contends that neither the magistrate's decision, nor the entry affirming that decision specifically states which evidence supports the respective decisions, and thus, both decisions are against the manifest weight of the evidence because the evidence fails to show that appellant's basic needs are not being met because of her illness.
 {¶ 16} Initially, we note that the magistrate is under no duty to specifically state upon which evidence he relied unless a party makes a request for findings of fact and conclusions of law under Civ.R. 52, or if findings and conclusions are otherwise required by law or by the order of reference. Civ.R. 53. Further, the record clearly supports the trial court's decision. Though she did not testify, per se, one cannot ignore appellant's actions in the courtroom. The transcript reveals that appellant did not act in accordance with the magistrate's instructions and engaged in such inappropriate behavior that the magistrate had to have her removed from the hearing. Further, Dr. Bates' testimony does in fact link appellant's mental illness to her being a substantial risk of harm to herself and others. As set forth above, Dr. Bates testified that he believes appellant represents a substantial risk of harm to herself and others as a direct result of her mental illness. (Tr. at 17.) Additionally, directly after describing appellant's behavior that resulted in somebody assaulting her, appellee's counsel inquired, "[s]he obviously can't take care of her basic physical needs?" to which Dr. Bates responded, "No. She's been evicted. She's homeless. She has no resources and she has no place to go." Id. Dr. Bates' testimony, when read in context, can only be interpreted as suggesting that appellant's illness is the cause of her inability to care for herself.[2]
 {¶ 17} Because there is competent, credible evidence for the trial court to find under a clear and convincing evidence standard that appellant has a substantial mental disorder that grossly impairs her functioning and that appellant should be hospitalized for the reasons set forth in R.C. 5122.01(B)(3) and5122.01(B)(4), we overrule appellant's first assignment of error.
 {¶ 18} In her second assignment of error, appellant contends that she was prejudiced due to ineffective assistance of trial counsel. Specifically, appellant directs us to her counsel's alleged failure to effectively cross-examine appellee's witness, Dr. Bates, and her counsel's failure to file objections to the magistrate's decision in accordance with the Ohio Civil Rules and the Local Rules of the Franklin County Probate Court.
 {¶ 19} "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."Strickland v. Washington (1984), 466 U.S. 668, 686,104 S.Ct. 2052. In order to establish a claim of ineffective assistance of counsel, a defendant must first demonstrate that his trial counsel's performance was so deficient that it was unreasonable under prevailing professional norms. Id. at 687. The defendant must then establish "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
 {¶ 20} According to Strickland:
A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Id. at 687.
 {¶ 21} "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689, quotingMichel v. Louisiana (1955), 350 U.S. 91, 101, 76 S.Ct. 158.
 {¶ 22} Appellant concedes in her brief that even if her counsel's performance was unreasonable, it is unlikely that the outcome of the proceedings would have been different. Thus, appellant realizes that her claim for ineffective assistance of counsel fails under the Strickland standard. Consequently, appellant argues that a different, less-stringent standard should be applied when reviewing ineffective assistance of counsel claims arising out of civil commitment hearings. Appellant urges this court to follow the Supreme Court of Montana in its rejection of the Strickland standard in the civil commitment context. In re Mental Health of K.G.F. (2001), 29 P.3d 485.
 {¶ 23} In In re Mental Health of K.G.F., the Supreme Court of Montana held that the application of the Strickland standard is not appropriate in involuntary civil commitment proceedings, and as a result Montana now considers five factors when reviewing an ineffective assistance of counsel claim in the context of civil commitment hearings: (1) whether competent counsel was appointed; (2) whether counsel conducted a thorough review of all records; (3) whether counsel knew what the client wanted to see happen; (4) whether the client knowingly and voluntarily talked to the clinicians and/or was the client advised of the right to remain silent or attend the examination; and (5) whether counsel vigorously advocated for his client. Extrapolated from Montana's standard, appellant asks this court to adopt the following standard: (1) whether, under the circumstances, counsel acted as a reasonably prudent lawyer with experience in this area would have acted; and (2) whether counsel's actions ensured strict compliance with the statutory requirements in obtaining the confinement order.
 {¶ 24} Our research reveals that no other jurisdictions, including Ohio, have followed the Supreme Court of Montana's departure from the Strickland standard, and a Washington Appellate Court recently rejected Montana's approach in In theMatter of the Detention of T.A.H.-L. Snohomish County v.T.A.H.-L. (2004), 97 P.3d 767 (finding that the Strickland
standard is sufficient to protect the right to the effective assistance of counsel for a civil commitment respondent.) Likewise, we do not share the Supreme Court of Montana's view, and reject appellant's request to depart from the Strickland
standard for reviewing an ineffective assistance of counsel claim arising out of a civil commitment hearing.
 {¶ 25} Viewing appellant's claims for ineffective assistance of counsel in light of Strickland, and in light of appellant's concession that her claims fail under Strickland, we overrule appellant's second assignment of error.
 {¶ 26} For the foregoing reasons, appellant's two assignments of error are overruled and the judgment of the Franklin County Court of Common Pleas, Probate Division, is hereby affirmed.
Judgment affirmed.
Petree and Travis, JJ., concur.
[1] The transcript indicates that the dialogue between the court and appellant continued in a similar manner until page 10.
[2] Dr. Bates' conclusions are further buttressed by the mental health affidavit of Mark Fettman, M.D. Though prepared prior to the hearing and filed in support of obtaining a temporary detention order, Dr. Fettman states that appellant is homeless and without any financial resources. The affidavit further provides that "[appellant's] mental illness has prevented her from holding down a job or taking care of her basic needs. * * * Due to her bizarre behavior in the community she has been assaulted by an unknown person. Her mental illness and bizarre behavior makes her vulnerable to further assaults by people she may come in contact with."