[Cite as *Smith Clinic v. Savage*, 2013-Ohio-748.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

THE FREDERICK C. SMITH
CLINIC, INC.,

    PLAINTIFF-APPELLEE,               CASE NO.  9-12-40

    v.

BRENT SAVAGE, M.D.,               O P I N I O N

    DEFENDANT-APPELLANT.

---

Appeal from Marion County Common Pleas Court
Trial Court No. 09-CV-0995

Judgment Affirmed

Date of Decision:    March 4, 2013

---

APPEARANCES:

    *Jeffrey A. Burkam*  for Appellant

    *Walter F. Ehrnfelt and Luke F McConville*   for Appellee

**PRESTON, P.J.**

**{¶1}** Defendant-appellant, Dr. Brent Savage, appeals the Marion County Court of Common Pleas' judgment finding that Dr. Savage owed plaintiff-appellee, the Frederick C. Smith Clinic, $56,826 pursuant to his employment contract. Dr. Savage argues the trial court erred when it failed to find that Smith Clinic breached the terms of the contract, that the trial court erred in finding that Dr. Savage's accounts receivable had vested with Smith Clinic, and that the trial court erred in failing to find that Smith Clinic must apply any payments received after Dr. Savage terminated his employment to the amount he allegedly owed Smith Clinic. For the reasons that follow, we affirm.

**{¶2}** The present case stems from an employment contract between Smith Clinic and Dr. Savage. Dr. Savage began his employment with Smith Clinic in July 2006. (P. Ex. 1). At that time, he signed an employment contract with Smith Clinic guaranteeing him an annual salary of $225,000 regardless of the amount of his collections or billing. (*Id.*); (Vol. I Tr. at 34). Dr. Savage's initial contract with Smith Clinic terminated on January 31, 2008. (P. Ex. 1).

**{¶3}** Dr. Savage signed a second employment contract with Smith Clinic for a term of employment from February 1, 2008 through January 31, 2009. (P. Ex. 3). The second contract provided Dr. Savage with an annual salary of $225,000, but also contained a year-end bonus provision. (*Id.*). According to the

contract, the year-end bonus would be calculated based on the accounts Smith Clinic collected as a result of Dr. Savage's medical services, minus Dr. Savage's share of Smith Clinic's expenses, minus the annual compensation Smith Clinic had already paid him. (*Id.*). If the result of the calculation was a positive amount, then Dr. Savage would be eligible for a bonus. (*Id.*). The contract further stated, "[i]f the result of this calculation is a negative amount, then such amount shall be treated as a cash advance by Corporation to Employee which shall be repaid immediately by Employee or offset against Employee's future salary until fully repaid." (*Id.*).

{¶4} In January 2009, Smith Clinic alleged Dr. Savage had a deficit amounting to $67,292 according to the year-end bonus calculation. (Vol. I Tr. at 66, 70); (P. Ex. 5). Smith Clinic sought to reduce Dr. Savage's future salary to repay the deficit. (Vol. I Tr. at 66, 70). Dr. Savage disputed that he was required to repay the deficit and did not want his future salary reduced. (Vol. II Tr. at 281). At the time the dispute arose, Dr. Savage had not yet signed a third employment contract with Smith Clinic to begin after his second contract terminated on January 31, 2009. (*Id.* at 322).

{¶5} During the following months, the parties continued to negotiate Dr. Savage's employment contract for the term beginning February 1, 2009, specifically the issue of his alleged deficit. (Vol. I Tr. at 73). Negotiations

continued until May 2009 when Smith Clinic withheld Dr. Savage's salary and applied the amount to his alleged deficit. (*Id.* at 67). Dr. Savage subsequently terminated his employment with Smith Clinic. (*Id.* at 67); (Vol. II Tr. at 245).

**{¶6}** On November 4, 2009, Smith Clinic filed a complaint against Dr. Savage alleging he breached his employment contract, was unjustly enriched, and had wrongfully retained possession of funds. (Doc. No. 1). Smith Clinic sought damages in excess of $25,000. (*Id.*).

**{¶7}** On April 19, 2010, Dr. Savage filed his answer, denying Smith Clinic's allegations. (Doc. No. 6). Dr. Savage also asserted a counterclaim, alleging Smith Clinic had breached its contract and verbal agreement with him, was unjustly enriched as a result of his employment, had converted funds that rightfully belonged to him, and that Smith Clinic was estopped from recovering damages. (*Id.*). Smith Clinic filed its reply on June 24, 2010. (Doc. No. 9).

**{¶8}** The matter proceeded to a bench trial. (Doc. No. 27). On January 31, 2012, the trial court found that Dr. Savage owed Smith Clinic $58,426.[1] (*Id.*). The trial court further found that based on the employment contract, Smith Clinic owned the rights to the amounts collected for professional services rendered by all of its physicians, including Dr. Savage. (*Id.*). The trial court found that Dr. Savage expressly declined to participate in Smith Clinic's retirement plan, so any

---

[1] The parties stipulated that, based on Smith Clinic's records, Dr. Savage had a deficit of $58,426. However, Dr. Savage contended that the records were unreliable.

amounts Dr. Savage believed Smith Clinic owed him from the retirement plan was the result of an accounting error. (*Id.*). The trial court stated that it could not conclude that Dr. Savage was entitled to any future money collected from Bucyrus Hospital because the contract for Dr. Savage's services was between Smith Clinic and Bucyrus Hospital. (*Id.*). The trial court also stated that Dr. Savage was not entitled to uncollected accounts from Marion General Health Center because Dr. Savage's compensation was based on money actually collected, not accounts receivable. (*Id.*). The trial court found that Dr. Savage was entitled to reimbursement for $1,600 worth of expenses related to his board certification testing. (*Id.*). The trial court concluded that Dr. Savage owed Smith Clinic a total of $56,826. (*Id.*).

{¶9} On February 13, 2012, Smith Clinic filed a motion requesting that the trial court grant it prejudgment interest pursuant to R.C. 1353.03(A). (Doc. No. 28). On March 22, 2012, Dr. Savage filed a motion in opposition to Smith Clinic's motion for prejudgment interest. (Doc. No. 35). On July 9, 2012, the trial court granted Smith Clinic's motion for prejudgment interest. (Doc. No. 40). The trial court calculated the total interest as $7,159.76, for a total final judgment amount of $63,985.76 in favor of Smith Clinic. (*Id.*).

{¶10} On July 12, 2012, Dr. Savage filed a notice of appeal.[2] (Doc. No. 41). Dr. Savage now raises three assignments of error for our review.

**Assignment of Error No. I**

**The Court erred as a matter of law when it failed to find that Plaintiff, Smith Clinic, breached the terms of its agreement with Dr. Savage.**

{¶11} In his first assignment of error, Dr. Savage argues that after the contract expired on January 31, 2009, Smith Clinic and he continued their employment relationship even though the arrangement was contrary to the language of the contract. Dr. Savage contends that Smith Clinic breached its contract with him by failing to fully collect on accounts receivable that were the result of services he performed as a surgeon. Dr. Savage also argues that Smith Clinic breached the contract by failing to pay him in May 2009. Dr. Savage contends that section 2 of the contract permitted him to address his alleged shortfall by either setting up a payment plan or paying off the amount in full. Dr. Savage argues that Smith Clinic could not unilaterally apply his salary to the shortfall.

{¶12} This case calls for an interpretation of the contract between the parties. "Contract interpretation is a matter of law, and questions of law are subject to de novo review on appeal." *St. Marys v. Auglaize Cty. Bd. of Commrs.*,

---

[2] Smith Clinic had previously filed a notice of appeal on February 29, 2012. (Doc. No. 30). This Court dismissed the appeal due to the pending motions regarding prejudgment interest.

115 Ohio St.3d 387, 2007-Ohio-5026, ¶ 38, citing *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108 (1995). "Absent ambiguity in the language of the contract, the parties' intent must be determined from the plain language of the document." *Huntington Natl. Bank v. A&J Plumbing, Inc.*, 11th Dist. No. 2011-G-3021, 2012-Ohio-526, ¶ 26, citing *J.B.H. Properties, Inc. v. N.E.S. Corp.*, 11th Dist. No. 2007-L-024, 2007-Ohio-7116, ¶ 10. However, when the contract is ambiguous, it will be strictly construed against the drafter. *Owusu v. Hope Cancer Ctr. of Northwest Ohio, Inc.*, 3d Dist. No. 1-10-81, 2011-Ohio-4466, ¶ 35, citing *McKay Mach. Co. v. Rodman*, 11 Ohio St.2d 77, 80 (1967).

### 1. Expired Contract

**{¶13}** Dr. Savage first argues that Smith Clinic breached the contract by continuing its employment relationship with him after the original contract expired on January 31, 2009. When an employee's services are continued without objection after an employment contract for a definite period of time has expired, "the inference is that the parties have assented to another contract for a term of the same length with the same salary and conditions of service, following the analogy of a similar rule in regard to leases." *Meek v. Solze*, 6th Dist. No. OT-05-055, 2006-Ohio-6633, ¶ 20, citing 1 Williston, Contracts, Rev.Ed. Section 90 and *Kelly v. Carthage Wheel Co.*, 62 Ohio St. 598 (1900).

**{¶14}** In the present case, David Miller, Smith Clinic's Executive Director, testified that there was no objection to Dr. Savage continuing his employment according to his expired contract during their negotiations.  (Vol. I Tr. at 25, 63).  Miller testified, "what we indicated is that we would continue the contract that had expired January 31, 2009 going forward, we would just continue that as if it had not expired."  (*Id*.).  Miller further testified, "[w]e indicated we wanted him to stay, he indicated he wanted to stay, we knew we needed to work out how we were gonna handle this deficit, but we would continue to move forward and he continued to see patients and we continued to pay him his draw."  (*Id*.).  According to Miller, "[w]e were operating as if the contract that had expired on January 31, 2009 was ongoing until we could replace it with a document that we all agreed to and signed.  We were in discussion about how to handle the various issues, most significantly his deficit from the preceding year."  (Vol. II Tr. at 334).  Dr. Savage testified, "I believe my responsibility was to continue to do the work that I was * * * basically was in my job description, continue to do everything I had before * * *.  Again with the hopes that we could come up with a contract."  (*Id*. at 322).

**{¶15}** We cannot find that Smith Clinic breached its contract with Dr. Savage by continuing their employment relationship after the contract expired.  Both parties testified that they continued to fulfill their responsibilities under the

prior contract while they worked towards resolving the deficit issue. We cannot find any evidence that either party objected to this arrangement, consequently, this Court can infer that the parties intended to extend the previous contract.

### 2. Collections

{¶16} Dr. Savage next argues Smith Clinic breached the contract by failing to fully collect on accounts receivable stemming from his work as a surgeon. In particular, Dr. Savage contends that he worked at Bucyrus Hospital for a stipend of $2,000 per month, but Smith Clinic failed to collect any payments from Bucyrus Hospital from February 2008 until the end of his employment. Dr. Savage also argues that he provided services to Marion General Hospital, but Smith Clinic did not receive any payments for those services either. Dr. Savage further contends that Smith Clinic has failed to apply for a significant portion of his stipend in Bucyrus Hospital's bankruptcy proceedings. Dr. Savage argues that he is entitled to money generated from the bankruptcy proceedings and from Smith Clinic's lawsuit against Marion General Hospital, which Dr. Savage alleges was filed after he left his employment with Smith Clinic.

{¶17} Miller testified that Bucyrus Hospital made two payments in 2008, one payment for $2,000 and the second for $3,000. (Trial Vol. I Tr. at 55). Miller testified that, "from the outset Bucyrus was not a prompt payor to say the least. And so we were continuously contacting Mr. Klein and asking him where were we

with being paid for the services." (*Id*.). Miller further stated, "[o]ur accounting department would have billed Bucyrus for the accounts and they would have also asked the people in their accounting department about payment. In addition when they weren't paying I made a number of phone calls to Mr. Klein * * *." (*Id*. at 56). Miller testified that Bucyrus Hospital filed for bankruptcy and Smith Clinic filed a claim for $19,000. (*Id*. at 57-58). Miller testified that Smith Clinic made the claim for $19,000, even though Bucyrus Hospital owed it a larger amount, "based on conversations with Bucyrus Hospital, what they said they would and wouldn't pay." (*Id*. at 59). Miller testified that, "[g]iven the known financial status of Bucyrus I didn't think it was worthwhile to spend money to pursue a suit against them." (*Id*. at 107).

{¶18} Miller testified that Marion General Hospital's program provided services for individuals who were uninsured and did not have the means to pay, and that Marion General "would pay specialists a fixed rate at the Medicare allowable for providing services to those patients * * *." (*Id*. at 138). Miller testified, "[w]e billed for claims just as we would billing for Medicare or Medicaid except instead of sending them to Medicare or Medicaid we sent them to the hospital who adjudicated them * * *." (Vol. II Tr. at 343-344). Miller also testified regarding Marion General Hospital, "[t]hey ran quite a bit behind in their processing of claims, there was always a pretty lengthy lag in terms of them timely

turning around the claims for payment, and then they quit making payments into the program on behalf of all the physicians." (Vol. I Tr. at 139). Miller testified that Marion General Hospital stopped paying claims for any services provided on October 1, 2008 and after. (*Id*. at 140).

{¶19} After reviewing Dr. Savage's employment contract with Smith Clinic and the relevant testimony, this Court cannot find that Smith Clinic breached the contract by failing to collect accounts receivable. The contract between Dr. Savage and Smith Clinic does not contain any provisions requiring Smith Clinic to take specific steps in its collection efforts. (P. Ex. 3); (D. Ex. 1). Furthermore, this Court cannot find that Smith Clinic's actions in this case, which were sending out bills, following up with phone calls, and eventually filing a claim in bankruptcy court against Bucyrus Hospital, were unreasonable. This Court declines to make a business judgment for Smith Clinic regarding whether additional measures should be taken when pursuing accounts receivable.

### 3. Withholding Salary

{¶20} Dr. Savage also argues Smith Clinic breached the contract by unilaterally deciding to apply his May 2009 salary to his deficit. Dr. Savage contends that the contract does not permit Smith Clinic to take this action and that Smith Clinic cannot recover under a contract it has breached.

{¶21} Section 4(B)(2) of the employment contract provides:

Employee will be eligible for a year-end bonus as follows: The year-end bonus will be equal to 100% of the calculated Shareholder compensation, as described in Section 4(B)(1) minus salary payments as specified in Section 4(A). If the result of this calculation is a negative amount, then such amount shall be treated as a cash advance by Corporation to Employee which shall be repaid immediately by Employee or offset against Employee's future salary until fully repaid.

(P. Ex. 3); (D. Ex. 1).

{¶22} Miller testified that Smith Clinic paid Dr. Savage compensation at an annual rate of $225,000. (Vol. I Tr. at 43). Each month, Smith Clinic would calculate whether each physician was bringing in enough income to cover his or her salary, or if the physician was falling short. (*Id.*). At the end of the year, Smith Clinic would determine whether each physician would receive a bonus that would be paid, or if the physician had a deficit that Smith Clinic needed to recover. (*Id.*). Miller testified that, "we only distribute money that we've actually collected. So if there's outstanding accounts receivable or if money owed us it's not factored into this computation. We only distribute money that we have essentially deposited in the bank." (*Id.* at 45). Miller testified that Smith Clinic subtracts a portion of its expenses from the money that each physician brings in,

including "the support staff costs, salaries, benefits, supplies, equipment, malpractice insurance, those types of expenses would have come against the collections." (*Id*. at 46).

{¶23} Miller identified Plaintiff's Exhibit 5 as Smith Clinic's records reflecting whether Dr. Savage would receive a bonus or was in a deficit from February 2008 until the end of his employment in May 2009. Miller testified that as of January 2009, Savage had a deficit of $67,292. (*Id*. at 66); (P. Ex. 5). Miller testified that, "instead of reducing his pay by $67,292, which would have happened under the contract, we were willing to write that off or forgive it over a five year period." (Vol. I Tr. at 66). According to Miller, Dr. Savage felt his arrangement with Smith Clinic was not financially viable. (*Id*. at 67). Miller testified:

> we needed to recover this deficit and we got the sense that Dr. Savage may be planning to leave, so we went ahead and indicated to him that we were gonna withhold his May paycheck as [a] first recovery attempt of the deficit that he owed for the preceding fiscal year and whatever had transpired subsequent to that.

(*Id*.).

{¶24} The plain language of the employment contract requires the employee, in this case Dr. Savage, to either repay any deficit immediately or offset

it against his future salary. Smith Clinic provided Dr. Savage with the option of offsetting the deficit against his future salary, but Dr. Savage chose to leave his employment with the Clinic instead. As a result, Smith Clinic could treat Dr. Savage's deficit as a cash advance requiring immediate repayment. We cannot find that offsetting Dr. Savage's deficit with the salary he would have received in May 2009 was a breach of contract since the deficit was treated as a cash advance that was due immediately.

{¶25} Dr. Savage's first assignment of error is, therefore, overruled.

### Assignment of Error No. II

**The Trial Court erred in finding that the written contract clearly vested ownership of all of Dr. Savage's accounts receivable with Smith Clinic.**

### Assignment of Error No. III

**The Court erred by not determining that the contract required Smith Clinic to apply amounts received after the departure of Dr. Savage to his shortfall and to forward to Dr. Savage all amounts received over and above his shortfall.**

{¶26} In his second and third assignments of error, Dr. Savage argues the trial court erred in finding that the accounts receivable had vested with Smith Clinic and that the trial court erred in not determining that any payments Smith Clinic received after Dr. Savage's departure should be forwarded to Dr. Savage. Dr. Savage contends that the contract is ambiguous and should be construed against Smith Clinic. Dr. Savage argues that Smith Clinic's bookkeeping

practices were questionable, so the trial court should not have relied on the records to determine whether he had a deficit. Dr. Savage contends that even if Smith Clinic is entitled to keep the accounts receivable, it is only entitled to keep enough of the receipts to make up the deficit. Dr. Savage argues that Smith Clinic should pay him any remaining accounts receivable.

### 1. Accounts Receivable

**{¶27}** Section 2 of the employment contract states, "Corporation shall be entitled to receive all fees and charges attributable to medical services rendered by Employee for or on behalf of Corporation." (P. Ex. 3); (D. Ex. 1). We find that this provision unambiguously provides Smith Clinic with ownership over all fees resulting from Dr. Savage's medical services as a Smith Clinic employee, including accounts receivable. This construction of the employment contract is consistent with the shareholder employment contract, which provides the calculation for Dr. Savage's bonus or deficit. (P. Ex. 3); (P. Ex. 4); (D. Ex. 1). Section 4(B) of the shareholder employment contract refers to "collections received," but makes no mention of accounts receivable when determining an employee's compensation. (P. Ex. 4). We cannot find any provision in the employment contract that entitled Dr. Savage to the accounts receivable, resulting in an ambiguous contract as he contends. Consequently, we find that the

employment contract unambiguously provides Smith Clinic with the right to all accounts receivable.

{¶28} This interpretation of the contract is also in line with the contract's intent, which creates an incentive for long term employment with Smith Clinic. Had Dr. Savage remained with Smith Clinic and Smith Clinic collected on the accounts receivable resulting from his medical services, Dr. Savage would have received income from those accounts. However, since Dr. Savage terminated his employment with Smith Clinic before it collected on those accounts receivable, the accounts were not included in his year-end bonus calculation and vested with Smith Clinic upon the end of Dr. Savage's employment. We agree with the trial court that Dr. Savage does not have any right to the accounts receivable based on the employment contract.

{¶29} Dr. Savage also makes an equitable argument that he is entitled to any accounts Smith Clinic receives beyond the amount of his deficit. In essence, Dr. Savage contends that Smith Clinic would be unjustly enriched by retaining accounts receivable resulting from his medical services in excess of his deficit. Dr. Savage argues Smith Clinic has collected $110,409 from his accounts receivable since May 1, 2009. Dr. Savage contends that even if this Court agrees that he must repay his deficit, Smith Clinic still owes him a balance of $61,837.

**{¶30}** To prevail on an unjust enrichment claim, the party must prove each of the elements, which include: "(1) a benefit conferred by a plaintiff upon a defendant, (2) knowledge by the defendant of the benefit, and (3) retention of the benefit by the defendant under circumstances in which it would be unjust to do so without payment." *Warneck v. Chaney*, 194 Ohio App.3d 459, 2011-Ohio-3007, ¶ 21 (3d Dist.), citing *City Rentals, Inc. v. Kesler*, 191 Ohio App.3d 474, 2010-Ohio-6264, ¶ 12 (3d Dist.). Unjust enrichment is an equitable doctrine based on a quasi-contract rather than contract law. *Homan, Inc. v. A1 AG Serv., L.L.C.*, 125 Ohio App.3d 51, 2008-Ohio-277, ¶ 21 (3d Dist.). This Court has previously held that "the doctrine of unjust enrichment cannot apply when an express contract exists." *Nationwide Mutual Fire Insurance Co. v. Delacruz*, 3d Dist. No. 5-10-17, 2010-Ohio-6068, ¶ 21, citing *Bickham v. Standley*, 183 Ohio App.3d 422, 2009-Ohio-3530, ¶ 14 (3d Dist.). In this case, neither party disputes the validity of the second employment contract, only whether Smith Clinic and Dr. Savage could extend it beyond its expiration date. Furthermore, we have found that the contract was extended and that it expressly provides Smith Clinic with the right to the accounts receivable. As a result, Dr. Savage cannot prevail on his unjust enrichment claim.

## *2. Modified Records*

**{¶31}** Dr. Savage finally argues that Smith Clinic had questionable bookkeeping practices, so the records it provided to the trial court were an unreliable source for determining the amount of his alleged deficit. In particular, Dr. Savage points to testimony presented at trial that Smith Clinic had modified some of its records prior to submitting them to the trial court, specifically Dr. Savage's retirement account and allocations of income from Marion Area Health Center (MAHC) and Marion Ancillary Services (MAS). Dr. Savage alleges that it is not possible to know the number of modifications Smith Clinic made to its records, and that they are too unreliable for Smith Clinic to use to meet its burden of proof in establishing the amount of Dr. Savage's deficit.

**{¶32}** MAHC and MAS are two entities that are part of Smith Clinic's ancillary services. (Vol. I Tr. at 47-48). Smith Clinic physicians may purchase an interest in these entities and then receive a portion of the profits. (*Id*. at 47-48, 50). Smith Clinic physicians who purchase an interest also share in the entities' losses. (*Id*. at 47-48). Section 4(B)(4) of the shareholder employment contract addresses the share of income Smith Clinic physicians can collect from MAHC and MAS. (P. Ex. 4). Subsection (a) of the provision states, "[t]he sum of total income derived from ancillary services as determined by the Corporation's Board of Directors, income received from Marion Health System, and Marion Ancillary

Services is divided by the total number of physician-employees *participating* in this formula." (*Id.*) (emphasis added).

**{¶33}** Miller testified that Smith Clinic had initially provided Dr. Savage with an allocation of the income received from MAHC and MAS even though he had not elected to participate by making an investment in the entities. (Vol. I Tr. at 50). Miller testified that Smith Clinic originally provided Dr. Savage with a share of the income as a benefit and because Smith Clinic wanted to help him build his practice. (*Id.*). Miller testified that Smith Clinic provided Dr. Savage with credit for earnings from MAHC and MAS for the fiscal year ending in January 31, 2009. (*Id.*). Miller testified that "[s]ubsequently to that we changed our position as a group and taken [sic] the position that for individuals to receive a credit for allocating income they need to make the investment and not just have it be given to them as a benefit." (*Id.*). Miller testified that Smith Clinic "subtracted the allocated income to Dr. Savage for this time period because at the time he left he had not made any investment in either entity." (*Id.*). Miller testified that Smith Clinic subtracted $6,000 of income that had been allocated to Dr. Savage from MAHC and MAS. (*Id.*).

**{¶34}** Victoria Matlack, the director of human resources at Smith Clinic, testified that Dr. Savage did not elect to participate in the 401K or profit sharing plans. (*Id.* at 235-236). Matlack testified that there was an error in Smith Clinic's

records indicating that Dr. Savage had money in the retirement plan. (*Id.* at 241). Matlack testified that she verified Dr. Savage's fund and confirmed that he did not have, and never has had, funds in the 401K plan. (*Id.* at 237). Matlack testified that she did not know how the error occurred, but "we looked at the plan and he was never expensed any money for retirement from my side." (*Id.* at 241).

{¶35} The trier of fact is in a better position to observe the demeanor of the witnesses, examine the evidence, and weigh the credibility of the testimony and evidence. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). The testimony presented at trial, if believed, provided evidence that Dr. Savage had elected not to participate in MAHC or MAS, so he did not have any right to income from those entities based on the contract's plain language. The shareholder employment contract requires physicians to participate in MAS and MAHC to collect a portion of the income. (P. Ex. 4). The trial testimony also established that Dr. Savage had elected not to participate in Smith Clinic's retirement plan and that any records indicating he may have money in the 401K plan were the result of an error. Based on this evidence, we cannot find that Smith Clinic's bookkeeping practices were so questionable that the trial court could not reasonably rely on them for the purpose of determining whether Dr. Savage had a deficit or was entitled to a bonus.

**{¶36}** Dr. Savage's second and third assignments of error are, therefore, overruled.

**{¶37}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI and SHAW, J.J., concur.**

**/jlr**